1897.]   Peo. ex rel. Inebriates' Home v. Comptroller.   399

N. Y. Rep.]                    Statement of case.

99:37 LRA 812
38 LRA 593

| | |
|---|---|
| 152 | 399 |
| 152 | 356 |
| 152 | 399 |
| 154 | 20, |
| 154 | 30 |
| j 154 | 53 |
| 152 | 399 |
| 158 | 492 |
| 152 | 399 |
| 172 | 4 59 |

The People of the State of New York ex rel. The Inebriates' Home for Kings County, Appellant, v. The Comptroller of the City of Brooklyn, Respondent.

1. Private Charitable Institutions — Effect of New Constitution upon Statutory Local Aid from Public Moneys. The Constitution of 1894 did not of itself annul and render inoperative mandatory provisions in existing statutes requiring the payment by localities of public moneys to private charitable institutions, by force of the new provision (Art. 8, § 14), that such payments "may be authorized, but shall not be required by the legislature;" but its effect was to leave such statutory provisions in force until superseded by subsequent legislation.

2. Limitation on Future Legislation. The above provision of the Constitution is a mere limitation on future legislative action, and was not intended to forbid the operation of existing laws.

3. Non-abrogation of Administrative Duty of Payment of Public Moneys to Private Charitable Institution. The above provision of the Constitution did not abrogate the purely administrative duty imposed upon the comptroller of the city of Brooklyn by chapter 169, Laws of 1877, of paying a portion of the excise moneys to the Inebriates' Home for Kings County, a private charitable and reformatory institution.

4. Requirement of Compliance with Rules of State Board of Charities. The new provision of the Constitution of 1894 (Art. 8, § 14), that no payments of public moneys by localities to private charitable institutions shall be made for any inmate who is not received and retained "pursuant to rules established by the state board of charities," operated presently, so that from the time rules should be established by the state board on the subject, no payments would be justified for inmates received or retained, in contravention of the rules of the board.

5. Failure of Private Charitable Institution to Earn Public Moneys. The courts will not compel the payment to a private charitable institution of public moneys, authorized to be paid only for the current support of inmates during the period when the fund accrued, where it appears that the institution had to a great extent ceased its operations and had not, except to a limited extent, performed the service which was the consideration of the payment to be made out of the public funds.

*People ex rel. Inebriates' Home* v. *Comptroller*, 11 App. Div. 114, affirmed.

(Argued March 1, 1897; decided April 20, 1897.)

Appeal from an order of the Appellate Division of the Supreme Court in the second judicial department, entered December 29, 1896, affirming an order of the Special Term

of said court in Kings county, which denied the application of the relator for a peremptory writ of mandamus requiring the comptroller of the city of Brooklyn to pay to it fifteen per cent of $1,041,797.05, that being the amount of money received by the comptroller from the excise commissioners of the city of Brooklyn for licenses granted by them under the excise laws of the state between the 1st of January, 1895, and the 1st of May, 1896.

The relator is a private charitable and reformatory institution located in the city of Brooklyn, incorporated by chapter 843 of the Laws of 1867, for the reception and retention of inebriates. By the original charter magistrates of Kings county were authorized, upon the consent of the trustees of the institution, to transfer to its custody persons confined in the jail or penitentiary for intoxication or habitual drunkenness. The authority of the magistrates has been changed from time to time in details, but has in substance been continued, and the last enactment on the subject is contained in the amending act, chapter 169 of the Laws of 1877, which defines the rights and powers of the relator and regulates the payment of public moneys in aid of the institution.

The inmates of the home consisted of two classes, the persons committed thereto by magistrates and those admitted by the trustees upon voluntary application. The home has accommodations for two hundred or more free patients. By the law of 1877 the comptroller of the city of Brooklyn was required to pay to the treasurer of the home fifteen per cent of all moneys received by him after the first day of April, 1877, from the excise commissioners of the city of Brooklyn, for licenses granted by them under the excise laws of the state, and a similar duty was imposed upon the boards of excise of the several towns of Kings county in respect of excise moneys derived from licenses granted by them. The section continues: " Said money shall be paid to the said treasurer upon the presentation of a certified copy of a resolution passed by the executive committee of said home declaring that it is necessary for the care and maintenance of the

indigent poor treated therein, and as much of said fifteen per cent only shall be paid to said treasurer as shall be certified by such resolution to be required for such support, and the payment of the legitimate claims on said home for the care and support of said indigent poor. The moneys herein required to be paid shall be so paid by the said comptroller and by the boards of excise of said towns within thirty days after the receipt thereof, or as soon after the expiration of said thirty days as the same shall be called for by resolution as aforesaid, and shall be applied to the care and treatment in said home of such persons, actual residents of the county of Kings, as in the judgment of said executive committee may be poor and in such indigent circumstances as to require relief and support and be proper subjects for care and treatment therein by reason of habitual drunkenness." The payments required by the act were made in full up to January 1, 1895, but subsequent to that date the comptroller refused to make further payments, claiming that the new Constitution which took effect on that day abrogated the compulsory clause in the statute of 1877, and relieved him from any further obligation to make the payments therein designated. The relator, denying this view of the effect of the new Constitution, made monthly requisitions on the comptroller, down to May 1, 1896, for the payment of the fifteen per cent of the excise moneys, certifying in the resolution on each occasion, that the money demanded "is necessary for the care and maintenance of the indigent poor patients treated in said institution, and the legitimate claims on said home for the care and support of said indigent poor." It appears from the papers before the Special Term, or it is clearly inferable from the uncontradicted facts, that failing to receive the payments demanded, the relator from January 1, 1895, received and retained in the institution only such persons as were committed or transferred thereto under commitments of magistrates, and that during the whole period from January 1, 1895, to May 1, 1896, there were committed to the home only about 120 persons whose average detention therein was for the period

51

of six months. The sum claimed by the relator is $156,269.55, being fifteen per cent of $1,041,797.05, the aggregate of the excise moneys received by the comptroller subsequent to January 1, 1895.

It appears that in February, 1895, the commissioners of excise of Brooklyn fixed the license fees at a largely increased rate from that before established, so that the revenue from this source in that year was two or three times larger than in the years preceding.

Further facts are stated in the opinion.

*Josiah T. Marean* for appellant. The Constitution, which went into effect on January 1, 1895, did not have the effect of its own force to repeal all acts of the legislature previously in force providing for payments out of the public moneys of municipalities to charitable institutions wholly or partly under private control. (Const. N. Y. art. 8, §§ 11–15; *People* v. *B., F. & C. I. R. Co.,* 89 N. Y. 75; L. 1895, ch. 754.) The inhibition of certain payments, contained in section 14 of article 8 of the Constitution, does not forbid the payments sought to be compelled in this case. (L. 1877, ch. 169.) The statute of 1877 does not violate the 10th section of article 8 of the Constitution, which forbids the giving of money by a municipal corporation, except in aid of the poor. (*White* v. *Inebriates' Home,* 141 N. Y. 123.) A peremptory mandamus is not discretionary in any proper sense. Where, upon the facts appearing, there is a clear right on the part of the relator, it must be granted, and the Court of Appeals will review the determination below. (*People ex rel.* v. *Common Council,* 78 N. Y. 56.)

*Joseph A. Burr* for respondent. After the opposing affidavits were interposed, the relator having still insisted upon his motion for a peremptory writ of mandamus, every statement of fact in the opposing affidavits must be taken to be true, and only those statements in the moving affidavits can be considered, which are statements of fact as dis-

1897.] Peo. ex rel. Inebriates' Home v. Comptroller. 403

N. Y. Rep.]    Opinion of the Court, per Andrews, Ch. J.

tinguished from conclusions of law, and which are undenied. (*People ex rel.* v. *Mayor, etc., of Brooklyn*, 149 N. Y. 215.) The city of Brooklyn cannot be held liable for the support of persons committed to the institution maintained by relator. (Const. of 1846, art. 8, § 2; Const. of N. Y. art. 8, § 10; *White* v. *Inebriates' Home*, 141 N. Y. 123; 2 R. S. [9th ed.] 1732, §§ 1–28; L. 1871, ch. 491; L. 1874, ch. 114; L. 1880, ch. 284.) If the act of 1877, which required the payment of these moneys, was not before unconstitutional, on the 1st day of January, 1895, it was modified and amended by the constitutional provision which then went into effect, that payment by cities to charitable, eleemosynary, correctional and reformatory institutions, wholly or partly under private control, for care, support and maintenance, may be authorized, but shall not be required by the legislature. (Const. N. Y. art. 8, §§ 11–15; *People ex rel.* v. *Supervisors*, 12 Misc. Rep. 187; Cooley on Const. Lim. [6th ed.] 100; *Law* v. *People*, 87 Ill. 385; *State* v. *Underwood*, 89 Ind. 110.) The writ of mandamus is a discretionary one, and will not be issued except where a clear legal right to it is shown. (Wood on Mandamus, 1; Merrill on Mandamus, 7.)

Andrews, Ch. J. In the case of *White* v. *Inebriates' Home for Kings County* (141 N. Y. 123) the question of the constitutionality of the provision in the act, chapter 169 of the Laws of 1877, requiring the comptroller of the city of Brooklyn to pay to the treasurer of the home fifteen per cent of the excise moneys received from licenses granted by the excise commissioners of the city, was presented and decided. The question arose under the Constitution in force prior to January 1, 1895, and the constitutionality of the provision was assailed on the ground that it violated section 11 of art. 8 of the then Constitution which prohibited any county, city, town or village giving any money or property in aid of any individual, association or corporation. This court decided that the provision in question was not in contravention of that section. The law of 1877 has not been repealed by the legislature, and the provision in

the act of 1877, requiring the comptroller to pay to the home the designated part of the excise moneys continued in force after the new Constitution went into effect, on the 1st day of January, 1895, unless it was abrogated by the operation of some provision in that instrument. It is the contention on behalf of the city that section 14 of art. 8 of the new Constitution annulled all mandatory provisions in existing statutes requiring the appropriation or payment by localities of public moneys to private charitable institutions, and that by force of the Constitution itself the act of 1877 ceased on the 1st day of January, 1895, to have further operation. Section 14 of art. 8 of the new Constitution is one of a series of five sections (sections 11–15) which, for the first time in our constitutional history, embodied in the organic law a complete system, regulating the supervision and the support in whole or in part out of public moneys of the organized charities of the state. The clause in section 14, upon which special reliance is placed to sustain the contention that upon the 1st day of January, 1895, all mandatory provisions in existing statutes for the appropriation or payment by any local authority of moneys in aid of private charitable institutions, were abrogated and annulled, is as follows : " Payments by counties, cities, towns and villages to charitable, eleemosynary, correctional and reformatory institutions, wholly or partly under private control, for care, support and maintenance, may be authorized, but shall not be required by the legislature." It may be assumed as an undoubted proposition that a new Constitution of a state, as the supreme law, supersedes all laws existing when the Constitution takes effect, in conflict with its provisions, if it appears from a just construction of the instrument that it was intended to have a present binding and operative force upon the matter or thing upon which the conflict arises. If the intention was to take away a legislative power which previously existed, and to annul legislative acts passed in pursuance of such power, and not solely to leave them to be changed by the legislature so as to bring them into harmony with the new

restriction, then all such acts must give way to the paramount authority, and they are as to all future transactions as though they had never been enacted. Before passing to the particular consideration of the new provisions in the Constitution of 1894, relating to charities, and especially of the clause in section 14, to which reference has been made, it may be well to refer briefly to the history of charities in the state of New York, and to the antecedent system which in many important respects was modified and supplemented by the charities article in the new Constitution. There are few subjects connected with the progress of the state which justify to a greater extent an honest pride on the part of its citizens than is afforded by the growth and development of its system of public and private charities. The duty of making public provision for the support of the poor in the ordinary way, by providing almshouses, supported at public expense, was undertaken by the state at the organization of the state government, and still continues to be discharged by the counties, cities and towns. But this system was soon found to be inadequate and unadapted to the needs of certain classes of dependent children and adults, who required different provisions adapted to their special conditions, or whose welfare required them to be withdrawn from the surroundings to which the ordinary pauper class in almshouses were subject. The interest of the humane and charitable was early aroused, and, as the result, numerous charitable foundations were established through private benefactions in the state for the care of special classes of unfortunate and dependent people. Orphan asylums, institutions for the deaf, the blind, the lame, foundling asylums and hospitals, industrial schools, and, indeed, charities of all descriptions, as wide and comprehensive as the wants which required relief, were organized for its administration. But these institutions, sustained by private benefactions alone, had not the means to meet the demands for succor made upon them. The state came to recognize its obligations and to perceive that these institutions were doing a work and discharging a duty which in a fuller measure devolved upon it. There

sprung from this recognition the system of state or local aid
to organized charities, and for a quarter of a century before
the adoption of the present Constitution provision was
made by law for public aid to private charitable corpora-
tions. By this aid the work of these institutions was enlarged,
and it is probably within bounds to say that on the 1st day of
January, 1895, there were 50,000 inmates of the various pri-
vate charitable institutions of the state receiving support from
public moneys, supplemented by private benefactions   It is
said that in the year preceding January 1, 1895, eight million
dollars of public money was contributed for the support of
inmates of these institutions and four million dollars by indi-
viduals. The method by which state or public aid was
furnished was not uniform. The greater part was given under
laws vesting in counties, cities and towns authority to raise
money by taxation to pay for the care and support of inmates
of these institutions, but imposing upon them no absolute
duty. But in many cases, especially in the great cities of
New York and Brooklyn, the legislature itself imposed the
duty and fixed the amount to be raised and designated the
institutions among which the money was to be divided, and
the general practice was to apportion to each of the institu-
tions a sum *per capita* for each inmate supported in the
institution, whose support was considered as properly charge-
able to the public. In other cases a gross sum was directed
to be raised and paid to designated institutions for the care
and support of inmates. (See chap. 410, Laws of 1882,
§ 194.) This was substantially the condition of the charities
of the state and of the legislation by which they were sus-
tained when the convention which framed the new Constitu-
tion met in 1894. The existing system was imperfect and
needed revision. There was well-founded objection to the
practice which had grown up by which the legislature
assumed to determine the amount which localities should
raise by taxation for charities and its distribution. It with-
drew the subject from the control of the local authorities to
which it properly should be remitted, and who had little, if

any voice in fixing the amount of taxation or in supervising the application of the sums to be raised. There was another defect in the existing system. The institutions receiving public aid were not subject to any authoritative supervision by competent public officials, and there was no adequate supervision or control in behalf of the public of the expenditure of the money appropriated. The determination of what inmates should be received as public charges, and how long they should be retained, was substantially left to the managers of the institutions, who for many reasons might not be the most proper persons to decide the question. The duty of the state is discharged when it affords necessary relief to those whose support is cast upon the public, and it is plain that it should be given for such a length of time only as necessity demands. There is nothing more to be deprecated than encouragement to pauperism, or the extension of public aid to those who are able to support themselves, or the keeping of inmates in charitable institutions, whether children or adults, beyond the time that they can be self-supporting, or when they could be safely allowed to shift for themselves. Nor are institutions of charity subserving their proper function when they relieve friends or relatives of indigent persons, able and bound to maintain them, from the burden of their support. The system of charities needed to be guarded and supported against possible abuses. The institutions, as a rule, were admirably managed, with great fidelity and in the spirit of the most disinterested benevolence. The framers of the new Constitution sought to promote the efficiency of the system of charities and to prevent abuses. The provisions which they framed proceeded upon these main lines. They constituted a state board of charities, changing the prior legislative board into a state board protected by the Constitution. They invested the new board with the power of visitation and inspection of all charitable and eleemosynary institutions, subject to certain exceptions not now material. (Art. 8, § 11.) But more far-reaching was the power conferred on the state board to make rules and regulations for the reception and retention of inmates in these institutions, accompanied

with a prohibition against public moneys being paid "for any inmate of such institutions who is not received and retained therein pursuant to rules established by the state board of charities." (Sec. 14.)   The framers of the new provisions did not attempt to interfere with the existing system by which public support of dependent classes might be furnished through the instrumentalities of private charitable institutions.   It preserved this system, but it guarded it at the point to which we have before adverted, namely, by imposing a limitation upon the legislature against mandatory laws operating upon localities, commanding the raising and appropriation of moneys to charitable institutions, and confining its power to the conferring upon localities an authority for that purpose.   This is the provision now in question.   It is claimed on behalf of the relator that the provision is a mere limitation on legislative power and that future action by the legislature and not the operation of existing laws is forbidden.   We are of opinion that this is the true construction of the clause in question.   The purpose of the Constitution on the subject of charities was to inaugurate a new system in respect to the appropriation of public moneys in aid of organized charities partly or wholly under private control.   The state legislature was deprived of the power to make a mandatory direction binding upon the local government.   It could authorize, but it could not command.   The language used is appropriate as a limitation upon the legislature in the future.   Payments by localities " may be authorized, but shall not be required by the legislature."   It would result from the contrary construction of the clause, that all existing provisions in aid of charitable organizations under private control, made in the form of mandatory legislation directed to localties, were blotted out on the 1st day of January, 1895, and the institutions receiving it would be deprived in many cases of the means of carrying on their work.   It is not reasonable to suppose that the Constitution, dealing with the great subject of charities, intended to cut off the means of support upon which institutions had relied, and leave them helpless until new legislation in accord-

ance with the new principle should be enacted.   It has been suggested that the operation of the Constitution was to modify mandatory clauses in existing statutes and transform them into permissive ones, and in this way conform them to the new principle.   However plausible this might be as applied to cases where the duty under existing statutes was enjoined upon boards or bodies having *quasi* legislative powers, the suggestion must be rejected as applied to the duty imposed on the comptroller of Brooklyn under the act of 1877.   The requirement that he should pay to the home a certain percentage of the excise moneys, imposed upon him a purely administrative duty.   The duty was not imposed on the common council of Brooklyn, and it is impossible to suppose that the Constitution constructively changed the law of 1877 so as to vest in this administrative officer the discretionary power of paying or withholding the appropriation to the home made by that act.   Manifestly the Constitution operated either as an absolute repeal of the act or left it in force until superseded by subsequent legislation.   It is claimed that if existing mandatory provisions in the charity laws were not repealed by force of the Constitution, it would be in the power of the legislature by inaction to continue them in force and thereby to that extent thwart the purpose of the Constitution.   Provisions are generally found in State Constitutions enjoining upon the legislature the passing of laws on special subjects to carry out the policy defined in the instrument.   Such provisions are incapable of enforcement by judicial or other mandate.   But they have generally been effective through the moral sanction which they possess to induce the legislature to discharge the duty cast upon it.   We conceive that it became the plain duty of the legislature, after the adoption of the Constitution of 1894, to bring the existing mandatory statutes making appropriations to charities into harmony with the new principle, and this seems to have been done in most cases by chapter 754 of the Laws of 1895.   Distrust of the legislature is not, we conceive, a proper ground for giving to the clause in the Constitution a force which its natural interpretation does

not warrant. The learned counsel for the city contends that
the clause in section 14, article 8, of the Constitution, imme-
diately following the one already quoted, sustains the con-
struction that the prior clause was intended to operate upon
existing statutes. The clause now referred to reads as fol-
lows : " No such payments shall be made for any inmate of
such institutions who is not received and retained therein pur-
suant to rules established by the state board of charities." We
entertain no doubt that this prohibition operated presently, that
is to say, that from the time rules should be established by the
state board regulating the reception and retention by charitable
institutions, no payments would be justified for the care, sup-
port and maintenance of inmates received or retained in con-
travention of the rules of the board. The clause last quoted
seems to have been primarily framed with reference to the
more usual practice of *per capita* payments for each inmate
of charitable institutions. But the cases where the payments
were to be made in gross are also within the spirit and inten-
tion of the constitutional inhibition, and the judicial armory is
furnished with adequate weapons for compelling a compliance
with, or preventing an evasion of this inhibition.

We have, for the reasons stated, reached the conclusion that
the existing system of statutory law for the sustentation of
charities administered by private incorporated institutions, did
not fall with the taking effect of the new Constitution. But
we are of opinion that, notwithstanding this conclusion, the
relator cannot maintain this proceeding. It must be conceded,
upon the construction we have given to the constitutional pro-
visions, that the act of 1877 remained in force after January
1, 1895. The duty of the comptroller to make the payments
under the law continued after that time, and he refused to
comply with the requirements made upon him by the execu-
tive committee of the home. The home continued to make
monthly requisitions until May 1, 1896, and then instituted
this proceeding to compel the payment to it of the sum of
$156,269.55, being fifteen per cent of the excise moneys
received by the comptroller from January 1, 1895. It is

not claimed, nor can it be pretended upon the facts, that an equivalent sum or any large proportion of such amount was expended by the home in the care and maintenance of inmates during the period mentioned. It is very probable that this was for lack of means to prosecute its charitable work by reason of the refusal of the comptroller to make the payments required. But it remains, nevertheless, true that the relator now seeks, by mandamus, to compel the payment into its treasury of a very large sum of public money, authorized to be paid to it for current support of inmates of the institution during the period when the fund accrued, although to a great extent it ceased its operations and did not, except to a limited extent, perform the service which was the consideration of the payment to be made out of the public funds. It is entirely plain that it was the intention of the act of 1877 to provide public aid for current expenses only, and that it was not intended to provide a fund for the uses of the home in future years, or an endowment for its support. It may be admitted that the comptroller, in refusing to comply with the requisitions made upon him, violated his duty, but the real question here is whether the court will compel the payment of public moneys to a private corporation under an appropriation made for a special and limited public purpose, where the application to such purpose has become impossible and the consideration for the appropriation has failed. We think not. If the relator has a claim for any amount it cannot be enforced in this proceeding. (See *Shepherd's Fold* v. *Mayor, etc.,* 96 N. Y. 137.)

The order of the Appellate Division should, therefore, be affirmed, with costs.

All concur.

Order affirmed.