The People of the State of New York ex rel. The New York Institution for the Blind, Respondent, *v.* Ashbel P. Fitch, Comptroller of the City of New York, Appellant.

1. Charitable Institutions — Supervision of State Board of Charities.   It is not necessary that an institution should be wholly charitable to fall within the provisions of the Constitution (Art. 8, §§ 11–15) and the statutes (L. 1895, chs. 754, 771) placing charitable institutions under the supervision and rules of the state board of charities.   It is enough if the institution is partly charitable in its character and purpose.

2. Educational and Charitable Institution.   The mere fact that an institution is partly educational does not exclude it from the provisions of the Constitution and statutes placing charitable institutions under the supervision and rules of the state board of charities.   If an institution is both educational and charitable, it falls within those provisions.

3. Institutions for Instruction of the Blind.   The fact that institutions for the instruction of the blind are subject to the visitation of the superintendent of public instruction (L. 1894, ch. 556, tit. 15, art. 14) does not prevent such an institution from being charitable in its character and

purpose, and, hence, also subject to the visitation of the state board of charities (Const. art. 8, § 13).

4. MEANING OF "CHARITABLE." The word "charitable," as used in the provisions of the Constitution and the statutes subjecting charitable institutions to the supervision and rules of the state board of charities, is to be given only its usual and ordinary meaning.

5. INSTITUTION FOR THE BLIND — CHARITABLE IN PART. The New York Institution for the Blind, an institution under private control, organized in 1831 (Ch. 214) for the special education of the blind, is to be regarded as a charitable institution so far as it clothes, educates and maintains indigent pupils at public expense or by donations from individuals; and as to such pupils, it is subject to the supervision and rules of the state board of charities.

6. INSTITUTION EDUCATIONAL IN PART. Such institution, so far as it educates pupils who pay for their tuition, board and maintenance, is not to be regarded as a charitable, but only as an educational institution, and as to those pupils the board of charities has no jurisdiction or power of supervision.

7. INSTITUTION OF CHARITABLE CHARACTER. Such institution, being to an extent charitable as well as educational, falls within the provisions of the Constitution and statutes as an institution of a charitable character or design.

8. STATE MAINTENANCE OF FREE EDUCATION. The provision of the Constitution (Art. 9, § 1), that "the legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated," relates only to the public or common schools of the state, and has no application to appropriations made by the state to an institution for the education of the blind, wholly or partly under private control.

9. STATE AID TO PRIVATE EDUCATION OF THE BLIND. Appropriations by the legislature to a local or private institution, for the education and support of the blind, are based upon and authorized by the provisions of the Constitution (Art. 8, § 10 of 1874; § 9 of 1894) which prescribe that the prohibition of state aid to any association, corporation or private undertaking shall not prevent the legislature from making such provision for the education and support of the blind as to it may seem proper.

10. PAST APPROPRIATIONS NOT VIOLATIVE OF THE CONSTITUTION. It does not follow that, if the New York Institution for the Blind is charitable, appropriations made to it in the past by the state for the education and support of pupils, and appropriations made by the counties of New York and Kings (under L. 1870, ch. 166, § 3) of the sums required for clothing the indigent pupils who were residents of the county making the appropriation, were violative of the Constitution (Art. 8, §§ 8, 11, of 1874).

11. MANDATORY APPROPRIATION. The charitable character of the New York Institution for the Blind is not changed if the provisions of the stat-

16   People ex rel. N. Y. Inst. for Blind *v.* Fitch.   [Oct.,

Statement of case.                    [Vol. 154.

ute (L. 1870, ch. 166, § 3) requiring the counties of New York and Kings to appropriate money to clothe indigent pupils is mandatory, and hence in conflict with the Constitution of 1894 (Art. 8, § 14), which is not decided.

12. Participation in Public School Fund. It does not follow from the fact that the charter of Greater New York (L. 1897, ch. 378, § 1161) authorizes the board of education to distribute a ratable proportion of the school fund to every pupil in the New York Institution for the Blind, that the institution must be regarded as purely educational and not charitable.

13. Public Payments to Charitable Institutions. The legislature cannot now authorize a locality to pay, nor can a locality in any case pay, its money to a charitable institution, wholly or partly under private control, for the care, support and maintenance of inmates who are not received and retained pursuant to the rules established by the state board of charities. (Const. 1894, art. 8, § 14.)

14. Payment Dependent upon Observance of Rules of Board of Charities. The New York Institution for the Blind being, to an extent, a charitable institution and, so far as it is charitable, subject to the visitation and rules of the state board of charities, no payment can be properly made to it from the moneys of the city and county of New York for the maintenance or support, including clothing, of any indigent inmate not received and retained by it pursuant to the rules of that board.

*People ex rel. Inst. for the Blind* v. *Fitch*, 12 App. Div. 581, reversed.

(Argued June 7, 1897; decided October 12, 1897.)

Appeal from an order of the Appellate Division of the Supreme Court in the first judicial department entered January 4, 1897, affirming an order of the Special Term which granted a peremptory writ of mandamus requiring the comptroller of the city of New York to audit and pay the claim of the relator for clothing furnished its inmates who resided in the city and county of New York.

The facts, so far as material, are stated in the opinions.

*T. E. Hancock* and *Francis M. Scott* for appellant. The relator is a charitable institution. Its status has been construed and decided by the courts. (*N. Y. Inst. for Blind* v. *How*, 10 N. Y. 84; *Riker* v. *N. Y. Hospital*, 66 How. Pr. 246; L. 1831, ch. 214; L. 1834, ch. 316; L. 1836, ch. 226; L. 1839, ch. 200; L. 1848, ch. 193; L. 1852, ch. 333; L. 1853, ch. 219; L. 1867, ch. 744; L. 1870, ch. 166; L.

1895, ch. 754; L. 1894, ch. 556; L. 1863, ch. 135; L. 1864, ch. 280; L. 1866, ch. 774; L. 1869, ch. 645; L. 1870, ch. 281; L. 1871, ch. 718; L. 1891, ch. 86.) The distinction drawn by the trial justice is manifestly arbitrary and fanciful, and in contravention of the purpose and design of the framers of the Revised Constitution. (L. 1867, ch. 591; L. 1873, ch. 571; L. 1895, ch. 771; L. 1896, ch. 546; *People ex rel.* v. *Roberts,* 148 N. Y. 365; *Jackson* v. *Phillips,* 14 Allen, 556; *Dartmouth College* v. *Woodward,* 4 Wheat. 518; *Russell* v. *Allen,* 107 U. S. 163; *Vidal* v. *Gerard,* 2 How. [U. S.] 127; *Chapin* v. *School District,* 35 N. H. 445; *Gerke* v. *Purcell,* 25 Ohio, 243; *Owens* v. *Missionary Soc.,* 14 N. Y. 398.) The functions of the superintendent of public instruction toward the relator do not exclude the jurisdiction of the state board of charities. (Const. N. Y. art. 8, § 13; L. 1839, ch. 200, § 6; L. 1855, ch. 539; L. 1860, ch. 464; L. 1862, ch. 351, § 2; L. 1867, ch. 744, § 22; L. 1870, ch. 166, § 3.)

*John M. Bowers* for respondent. The New York Institution for the Blind is not of a charitable, eleemosynary, correctional or reformatory character, and, therefore, is not subject to the visitation of the state board of charities, and is not subject to the portion of section 14 of article 8 of the Constitution providing that payments by counties, cities, etc., to charitable, eleemosynary, correctional and reformatory institutions wholly or partly under private control for care, support and maintenance may be authorized, but shall not be required by the legislature, and providing that no such payments shall be made for any inmate of such institutions who is not received and retained therein pursuant to rules established by the state board of charities. (*Asylum* v. *Phœnix Bank,* 4 Conn. 177; Angell & Ames on Corp. 29; *Dartmouth College* v. *Woodward,* 4 Wheat. 640; *Williams* v. *Williams,* 8 N. Y. 532.) Under the Constitution of 1894 the legislature may appropriate money for the education of persons in the New York Institution for the Blind, although such persons are not received and retained pursuant to rules made by the

state board of charities. (Const. N. Y. art. 8, § 9; *Shepherd's Fold* v. *Mayor, etc.*, 96 N. Y. 137; *Hoey* v. *Gilroy*, 129 N. Y. 138; *Townsend* v. *Little*, 109 U. S. 504; *Standon* v. *Oxford University*, W. Jones, 96; *Churchill* v. *Crease*, 5 Bing. 180; *De Winton* v. *Brecon*, 26 Beav. 533; *State* v. *Trenton*, 38 N. J. L. 68.) The intent of the Constitution was to subject alone institutions distributing alms for the support and maintenance of the poor to the visitation of the state board of charities. It was not the intent of the Constitution to subject educational institutions to the supervision of such board. (Const. N. Y. art. 9, § 1.) The acts of the legislature of the state of New York are in strict accord with our contention. (L. 1895, ch. 771; L. 1894, ch. 556; L. 1896, ch. 546, art. 1, § 2.) The enactment of chapter 193 of the Laws of 1848, authorizing the performance by the relator of charitable work, and the subsequent repeal of such statute, are conclusive as to the present status of the relator. (L. 1848, ch. 193; L. 1859, ch. 278; L. 1862, ch. 411.)

MARTIN, J. The question presented in this case involves the consideration and construction of certain provisions of the Constitution and of the statutes by which the relator was organized and continued, and by which it has been supported and the management of its affairs controlled.

These provisions of the Constitution are new, having gone into operation on the 1st day of January, 1895. So far as applicable here they provide: " Neither the credit nor the money of the state shall be given or loaned to or in aid of any association, corporation or private undertaking. This section shall not, however, prevent the legislature from making such provision for the education and support of the blind, the deaf and dumb, and juvenile delinquents, as to it may seem proper." (Art. 8, § 9.)

" No county, city, town or village shall hereafter give any money or property, or loan its money or credit to or in aid of any individual, association or corporation, or become directly or indirectly the owner of stock in, or bonds of, any associa-

tion or corporation; nor shall any such county, city, town or village be allowed to incur any indebtedness except for county, city, town or village purposes. This section shall not prevent such county, city, town or village from making such provision for the aid or support of its poor as may be authorized by law." (Art. 8, § 10.)

Section eleven of article eight provides for a state board of charities, which shall visit and inspect all institutions of a charitable, eleemosynary, correctional or reformatory character, except those for the insane and adult criminals.

Section thirteen provides that the visitation and inspection provided for therein shall not be exclusive of other visitation and inspection (then) now authorized by law.

Section fourteen declares: " Nothing in this Constitution contained shall prevent the legislature from making such provision for the education and support of the blind, the deaf and dumb, and juvenile delinquents, as to it may seem proper; or prevent any county, city, town or village from providing for the care, support, maintenance and secular education, of inmates of orphan asylums, homes for dependent children or correctional institutions, whether under public or private control. Payments by counties, cities, towns and villages to charitable, eleemosynary, correctional and reformatory institutions, wholly or partly under private control, for care, support and maintenance, may be authorized, but shall not be required by the legislature. No such payments shall be made for any inmate of such institutions who is not received and retained therein pursuant to rules established by the state board of charities. Such rules shall be subject to the control of the legislature by general laws."

After the adoption of the amended Constitution, the legislature enacted a statute which, in substance, authorized the administrative boards or officers of counties, towns and municipalities, in their discretion, to appropriate and pay to charitable, eleemosynary, correctional or reformatory institutions, wholly or partly under private control, for the care, support and maintenance of inmates, but to be made only for such as

20    People ex rel. N. Y. Inst. for Blind *v.* Fitch.    [Oct.,

Opinion of the Court, per Martin, J.    [Vol. 154.

were received and retained pursuant to rules established by the state board of charities. (Laws 1895, ch. 754.)

In the same year the legislature passed an act to revise and consolidate the laws relating to that board, which, in substance, declared that it should be its duty to visit, inspect and maintain a general supervision of all institutions, societies or associations which were of a charitable, eleemosynary, correctional or reformatory character, whether state or municipal, incorporated or not incorporated, which were made subject to its supervision by the Constitution ; that the institutions subject to its supervision should include all institutions, societies and associations which were of a charitable, eleemosynary, reformatory or correctional character or design, and that institutions for the deaf and dumb and blind should be subject to such visitation and inspection by the state board of charities as the Constitution provides. (Laws 1895, ch. 771, §§ 2, 9, 11.)

It is upon these provisions of the Constitution and statutes that the appellant relies. His claim is that, as the inmates of the relator were not received or retained by it pursuant to the rules established by the board of charities, it was not entitled to the relief which has been awarded. That the relator was wholly or partly under private control, and that the inmates for whose clothing it seeks to recover were not so received or retained, are admitted.

This court has already held that the provisions of the Constitution relating to this subject operated presently, so that from the time rules were established by the state board of charities no payments for inmates not received or retained in pursuance thereof would be justified. (*People ex rel. Inebriates' Home* v. *Comptroller*, 152 N. Y. 399.)

Indeed, it is practically conceded by both parties that if the relator is a charitable, eleemosynary, correctional or reformatory institution, the decisions of the courts below were incorrect and the orders appealed from should be reversed. That it is either a correctional or reformatory institution is claimed by neither. Thus, the single question to be determined by

this court is whether the relator is a charitable or eleemosynary institution.

To a proper understanding of that question it is necessary to ascertain the nature of the New York Institution for the Blind and the purpose for which it was organized and continued. To that end, a brief history of its organization, the management of its affairs, the manner in which it has been supported, and the class of persons who have been its inmates, seems to be required.

In 1831, Dr. Ackley, who had previously been active in organizing and carrying into operation institutions for the education of the deaf and dumb, turned his attention to the matter of the instruction of the blind. Associating with himself a number of other benevolent gentlemen, they sought to establish an institution wherein the unfortunate blind might be educated, and at the same time learn some useful trade or business by which to obtain a livelihood in after years. With this object in view, they procured the institution of the relator to be organized under and by chapter 214 of the laws of that year. The purpose of its organization, as stated in that act, was the instruction of children who were born blind or might have become so by disease or accident, and it required the institution to apply its funds or property to that purpose alone. Its first work seems to have been commenced that year in a small room in Canal street, where children taken from the almshouse were instructed under the control of Dr. John D. Russ, who remained in charge of the institution until its utility was established. Its first president was Samuel Ackley, and there were associated with him, as managers and officers of the institution, gentlemen whose known philanthropy was such as to show quite plainly that the purpose of the institution was a benevolent one, and that it was not intended to be one of profit to the corporators. Although the education of the blind had previously been, to some extent, successfully attempted in Europe, the relator seems to have been a pioneer in that work in this country. An institution had been organized in 1829 in Massachusetts, through

the exertions of Dr. John D. Foster, under the name of the "New England Asylum for the Blind," which was subsequently known as the "Perkins' Institution and Massachusetts Asylum for the Blind," but it was not opened until 1832. It was first under the charge of Dr. Samuel D. Howe, who commenced in a private house on Pleasant street in the city of Boston with six pupils. In 1833 a similar institution was organized in Philadelphia through the efforts of Robert Vaux. Thus, the idea of organizing special institutions for the instruction of the blind seems to have occurred to humane and benevolent persons in New England, New York and Philadelphia at about the same time, and without any apparent concert of action. All these institutions were organized and carried into operation through the efforts of the benevolent, and to accomplish a work of charity that had hitherto been neglected in this country.

In 1834 (Chap. 216) the relator was authorized to receive four indigent blind persons from each "senate" district in like manner and at like expense to the state as provided by law for the indigent deaf and dumb. Such indigent blind persons, besides their literary or school education, were to be instructed in some trade or employment taught and carried on in the institution.

At that time the deaf and dumb were furnished with board, lodging and tuition for which the state paid the institution in which they were maintained and educated. (Chap. 234, Laws of 1822; chap. 170, Laws of 1830.)

In 1836 (Chap. 226) twelve thousand dollars was appropriated to be paid to the relator to purchase in fee simple the two acres of ground occupied by it and to defray the expenses of repairing the buildings thereon, the conveyance to be made to the state, and it was to receive from each "senate" district four indigent blind persons in addition to the number then supported by the state to be supported in like manner and at like expense. In the same year, by chapter 399, the preceding statute was amended and partially repealed. It made the appropriation of twelve thousand dollars subject to the

condition that the managers should raise eight thousand dollars, which, with the twelve thousand dollars, was to be applied to the purchase of the premises occupied by the relator, to the erection of a workshop, and to repair the buildings thereon.   It then provided that the title should be vested in the managers, but that the premises so purchased should be used by them solely for the benefit of the blind and as provided by the third section of chapter 226, which required the managers to receive from each " senate " district four indigent blind persons in addition to the number then supported by the state.   The managers were required to report to the legislature each year.

In 1839 (Ch. 200) the relator was authorized to receive from each " senate " district eight additional indigent blind persons, to be educated and maintained in the same manner as provided in the previous statutes, and the sum of fifteen thousand dollars was appropriated to be paid in three annual installments, upon condition that the managers should raise ten thousand dollars, which sums were to be applied to pay for the labor and materials necessary to complete the structure upon the premises and to remove the old buildings thereon. It also provided for clothing such pupils by the counties from which they were sent, the amount not to exceed twenty dollars for each pupil.

In 1841 (Ch. 175) the legislature appropriated to the relator the sum of five thousand dollars for the purpose of leveling and grading the grounds belonging to it, providing necessary fixtures, and erecting and completing a wing to the main building, on condition that the relator should raise the sum of seven thousand dollars to be applied to that purpose.

In 1845 (Ch. 58) there was appropriated to the relator the sum of twenty-five thousand dollars, five thousand dollars to be paid annually for the period of five years, and the managers were required to report under oath to the legislature as to the expenditure of the money so appropriated.

In 1848 (Ch. 193) the act of 1831, organizing the relator, was amended by adding, " and also for the purpose of afford-

ing an asylum and employment for other blind persons." By the same act the legislature appropriated to the relator the sum of fifteen thousand dollars to be applied to the erection of work shops and other necessary buildings for providing an asylum and employment for the adult blind.

In 1852 (Ch. 333) the act incorporating the relator was continued, and it was provided that it should receive from each " senate " district four indigent blind persons to be maintained and educated at the expense of the state, the indigent blind persons then in the institution to form a part of the number to be admitted under that act.

In 1859 (Ch. 278) it was provided that the relator might sell or convey its real estate in the city of New York between Thirty-third and Thirty-fourth streets and Eighth and Ninth avenues, when the managers deemed it expedient; that one hundred thousand dollars of the amount received should be invested upon bond and mortgage, eight thousand dollars applied equally to the immediate relief of certain of the adult blind in the institution, the residue expended in the purchase of other real estate for the use of the institution and the erection of suitable buildings, and that any balance should be invested in stocks of the state, or of the cities of Brooklyn or New York for the benefit and use of the relator.

In 1853, $16,640 was appropriated for the instruction of one hundred and twenty-eight pupils in that institution.

And an examination of the various supply bills passed each year from 1853 to the present time, discloses appropriations of from ten to fifty thousand dollars made in nearly every year for the support of the indigent inmates of the relator, and that they were generally made under the title of appropriations for charitable institutions.

In 1867 (Ch. 744) the New York State Institution for the Blind at Batavia was established and a general scheme for the care and education of the blind was inaugurated. By that statute the relator was to continue to have the custody, charge, maintenance and education of the pupils intrusted to it by the state, to be compensated as before, and to receive the

same amount from the counties for clothing, until the state institution should be ready to receive pupils, when a portion of them was to be transferred to it. The relator, however, was to retain and to continue to receive all pupils from the counties of New York and Kings, to be maintained and educated by it, and to be compensated by the state for their maintenance and education, and for their clothing by the counties from which they were sent.

In 1870, an act amending the act incorporating the relator authorized it to receive all such blind persons from New York and Kings between the ages of eight and twenty-five years as the superintendent of public instruction should appoint and the managers should deem of sufficient character and capacity for instruction, who were to be maintained, educated and supported by the relator at the expense of the state, with a provision authorizing and directing the supervisors of those counties where, in the opinion of the superintendent, the parents or guardians were unable to furnish them with suitable clothing, to annually raise and appropriate fifty dollars for each pupil, to be paid to the institution and applied in furnishing them therewith.

When the relator's claim arose, article fourteen of title fifteen of the Consolidated School Law (L. 1894, ch. 556) provided that all persons possessing the necessary qualifications, who were residents of New York, Kings, Queens, Suffolk, Richmond, Westchester, Putnam and Rockland counties, should be sent to the institution of the relator; that their board, lodging and tuition should be paid by the state; that appointments to the institution should be made by the superintendent of public instruction, and where, in his opinion, the applicants were able to bear a portion of the expense, he might impose conditions by which some share of the expense of clothing and education should be borne by their parents, guardians or friends.

The period of instruction for such pupils was five years, but it might be extended to not exceeding eight.

4

During the first thirty-nine years of its existence, the whole number of pupils received by the relator was one thousand and one, being an average of about twenty-six a year. Assuming that each remained in the institution the full term of five years, the average number of pupils in the institution was one hundred and thirty, and about the same number as there were of the indigent blind, who were, before 1870, educated by the relator at the expense of the state. There are now in the institution one hundred and seventy-seven pupils, thirty of whom are residents of the state of New Jersey, and the remainder are from the counties of New York, Kings, Queens, Suffolk, Rockland and Richmond. Of these ninety-five are from New York, and the bill presented by the relator for clothing shows that eighty-eight were indigent pupils, and hence that all the pupils in the institution from the county of New York, except seven, were indigent pupils, educated, maintained and clothed by the state and county.

An examination of the history of the relator, of the statutes organizing and continuing it, and the statutes relating to the management of the affairs of its institution, including the manner of its support and the class of persons who became its inmates, shows that the purpose of its organization was a benevolent one, and that during nearly the entire time, from its organization to the present, it has been supported, and its property purchased and maintained mainly by appropriations made by the state, and that it has been treated and regarded as one of the charitable institutions therein. Indeed, that its purpose was a benevolent one was practically admitted by Mr. Waite, who for many years has been the superintendent of the relator, as in his report for the year 1887 he in substance said that experience had proved that these schools were essential to the well-being of society, and that private philanthropy and public policy could find no work more beneficent and wise in which to unite.

The relator is, doubtless, to an extent, an educational institution. But that fact alone does not justify the conclusion that it is not a charitable institution within the meaning and

intent of the Constitution and statutes. An institution may be in a sense educational and at the same time be wholly or partly charitable, as the education and maintenance of indigent pupils, while being educated, may be the subject of charity as well as support alone. An institution may be both educational and charitable, and if so, it falls within the provisions of the Constitution and statutes, as it is to be observed that the provisions are that the board of charities shall visit and inspect all institutions which are of a charitable character or design, and, hence, to fall within that description, it is not necessary that the institution shall be wholly charitable. It need only be an institution which is wholly or partly charitable in its character and purpose.

Nor is the fact that institutions for the instruction of the blind are made subject to the visitation of the superintendent of public instruction controlling in determining this question. It may be conceded that this institution is partially educational and subject to the visitation of the superintendent of public instruction, and yet by no means follow that it is not an institution which is charitable in its character and purpose, and, therefore, also subject to the visitation of the board of charities, as the Constitution provides that the visitation by the board of charities is not exclusive of any visitation then provided by law, which would clearly include the visitation by the superintendent of public instruction.

The obvious purpose of the legislature in incorporating and continuing the relator, as well as in appropriating the money of the state to the purchase of its real estate, to the erection of its buildings thereon, and to the support of its indigent inmates, was to aid in providing for the education of the unfortunate blind, and, so far as necessary, to aid in supporting and maintaining them, at least while acquiring an education. A need existed on the part of these afflicted people for an education, if one could be acquired. To accomplish this, special schools employing special methods and special appliances were required. Without the assistance of the state, or the benefactions of individuals, it could not be obtained. To

28   People ex rel. N. Y. Inst. for Blind v. Fitch.   [Oct.,

Opinion of the Court, per Martin, J.        [Vol. 154.

supply this necessity, the relator was organized, and the expense of the education of its pupils was defrayed by the state and private contributions, as will be seen from the statutes referred to and the decisions of our courts in relation to bequests to it. (*N. Y. Institution for the Blind* v. *How's Executors*, 10 N. Y. 84; *Riker* v. *Society of the N. Y. Hospital*, 66 How. Pr. 246, 254.) It seems quite plain that an institution thus organized and maintained must be regarded as one of a charitable character within the intent and meaning of the Constitution and statutes.

That the New York Institution for the Blind was regarded by the framers of the present Constitution as a charitable institution, as well as educational, is manifest. The attention of the legislature and of the people had been previously called to the subject of the appropriation of the money of the state to the support of the deaf and dumb and blind. In 1891, Superintendent Draper called especial attention to the fact that more than $262,000 was annually appropriated to the support of these institutions, that the supervision of the state over them was inefficient, and then observed: "The unadvisedness of expending so much money from the state treasury without close state supervision, cannot anywhere be questioned." It is quite obvious that this with other similar suggestions, the discussion of the subject by the public press, and the numerous petitions presented, called the attention of the convention to the necessity for a closer and more efficient supervision of these institutions. This was a subject which, in the language of the president of the convention, " deeply agitated the minds of the people of the state," and led the convention to the adoption of the provisions under consideration. The president, in stating what had been accomplished by the convention, among other things, said : " Besides that, we have secured the regulation of the State Board of Charities to this effect : That wherever any public money is devoted to a private charity for the public service, it shall continue under public control, and the vigilant eye and the strong arm of the people shall be able to follow every dollar of the public

money into every institution to which it is so devoted." Again, when we refer to the debates of the convention upon the subject, they show that it was its plain intent to include the relator among the charitable institutions of the state. While referring to the question of the jurisdiction of the state board of charities under the present Constitution, Mr. Lauterbach, who was chairman of the committee on charities, expressly stated that it would have jurisdiction of two institutions for the blind, obviously meaning the relator and the state institution at Batavia, as there seems to be no other in the state.

The arrangement of the provisions of the Constitution, as well as the language employed, indicates the same purpose. It will be observed that sections nine to fifteen of article eight, which contain the provisions as to the education and support of the blind, the deaf and dumb and juvenile delinquents, relate only to charitable, eleemosynary, correctional or reformatory institutions, while no mention is made of educational institutions which are not of a charitable character, and sections one to four of article nine relate to institutions within the state which are purely educational.

Besides, the various officers of the state, whose duties have led them to consider the relation of the New York Institution for the Blind to the state, have, with great uniformity, regarded it as one of the charitable institutions therein. It has been so treated by the several comptrollers of the state, the superintendents of public instruction, the boards of charities, and by the legislature as well, as will be seen by an examination of the reports of these officers and boards and the various acts of the legislature appropriating the money of the state for the purchase and maintenance of its property, and for the support of the indigent inmates therein.

It is doubtful if it can be fairly said that the principle here involved has not already been decided by this court. In *N. Y. Institution for the Blind* v. *How's Executors* (10 N. Y. 84), after reviewing the statute by which the relator was organized and the subsequent statutes relating to its manage-

ment and the support of its inmates, this court held that the relator was an institution for the support and education of the indigent blind, and was properly described as an institution for the instruction and maintenance of the indigent blind of the city of New York.

In *Riker* v. *Leo* (115 N. Y. 93, 102) that case was referred to by Judge Gray, who said : " It was held that though the act of incorporation did not bring the objects of the institution within those described in the will, that ' subsequent legislation had so far modified the charter of the corporation in those particulars that when the will was made these several circumstances had been engrafted upon it and might well enter into a description of its general scope and purposes.' "

In *People ex rel. Inebriates' Home* v. *Comptroller (supra)*, Andrews, Ch. J., quite thoroughly and exhaustively examined and discussed the history of the public charities of the state, and the origin and purpose of the provisions of the present Constitution relating to that subject.   The opinion in that case shows quite plainly that the purpose of the framers of the present Constitution was to bring under the supervision of the board of charities all corporations or institutions of the state that were charitable or of a charitable character or design, which were wholly or partly under private control, and to prohibit the payment of any public money for the care or maintenance of any inmate of such an institution who was not received and maintained pursuant to rules established by that board.   It also shows that the institutions for the care and education of the blind were regarded as charitable institutions within the meaning of the Constitution and statutes passed in pursuance of its provisions.   The opinion in that case is an interesting one, has an instructive and important bearing upon the question under consideration, and seems to practically dispose of it.

Moreover, when we consider the decisions in other jurisdictions and the doctrine laid down by text writers, as to what is a charitable institution or a charitable use or trust, they seem to lead to the same conclusion.   Thus, in *Asylum* v. *Phœnix*

*Bank* (4 Conn. 172), where a corporation had for its sole object the education and instruction of the deaf and dumb, which supported and instructed indigent persons of that class gratuitously, received a pecuniary compensation from pupils of ability to make it, derived its means of dispensing charity from the donations of individuals and of the public, and applied its funds exclusively to the general object of its institution, it was held that it was an institution of a charitable or eleemosynary character. *Russell* v. *Allen* (107 U. S. 163) is to the effect that a gift to be employed in founding an institution for the education of the youth of a county was a charitable gift.

In *Vidal* v. *Girard's Executors* (2 How. [U. S.] 127) it was said that donations for the establishment of colleges, schools and seminaries of learning, especially for orphans or poor children, were charities in a judicial sense. In *Chapin* v. *School District* (35 N. H. 445) it was held that a gift to promote education was a charity. *Gerke* v. *Purcell* (25 Ohio St. 229) is to the effect that a charity, in a legal sense, includes not only gifts for the benefit of the poor, but endowments for the advancement of learning, or institutions for the encouragement of science and art, without any particular reference to the poor, and that schools established by private donations, and which are carried on for the benefit of the public, not with a view of profit, are institutions of purely public charity. The opinion in that case by Judge White is an instructive one upon this question, and he cites many authorities which have a direct bearing upon the question as to what is a charity or a charitable institution. A gift designed to promote the public good by the encouragement of science, learning and the useful arts, without any reference to the poor, is a charity. (*American Academy* v. *Harvard College*, 12 Gray [Mass.], 582.) To establish a professorship of the fine arts in a university, or to found an agricultural college, is a charity. (*Cresson's Appeal*, 30 Penn. St. 437 ; *Price* v. *Maxwell*, 28 Penn. St. 23 ; *Taylor* v. *Trustees, etc.*, 34 N. J. Eq. 101.) In *Jackson* v. *Phillips* (14 Allen, 539, 556) Gray, J., referred to the definition of the word " charitable," as given by Mr.

Binney, who defined a charitable or pious gift to be, "Whatever is given for the love of God, or for love of your neighbor, in the catholic or universal sense — given from these motives and to these ends — free from the stain or taint of every consideration that is personal, private or selfish." That definition was approved by the Supreme Court of Pennsylvania in *Price* v. *Maxwell* (28 Penn. St. 35). The judge then referred to the rule of Lord Camden, adopted by Chancellor Kent, by Lord Lyndhurst, and by the Supreme Court of the United States, which is: "A gift to a general public use, which extends to the poor as well as rich." (*Jones* v. *Williams*, Ambl. 652; *Coggeshall* v. *Pelton*, 7 Johns. Ch. 292; *Mitford* v. *Reynolds*, 1 Phil. Ch. 191, 192; *Perin* v. *Carey*, 24 How. [U. S.] 506.) He then gave his own definition of the word "charity," as follows: "A charity, in the legal sense, may be more fully defined as a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering or constraint; by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works, or otherwise lessening the burdens of government." In *Dartmouth College* v. *Woodward* (4 Wheaton, 526, 542) Chief Justice Marshall held that that college was an eleemosynary and private corporation.

In Angell & Ames on Corporations it is said: "Eleemosynary corporations are such as are instituted upon a principle of charity, their object being the perpetual distribution of the bounty of the founder of them to such persons as he has directed. Of this kind are hospitals for the relief of the impotent, indigent and sick, or deaf and dumb. And of this kind, also, are all colleges and academies which are founded where assistance is given to the members thereof, in order to enable them to prosecute their studies, or devotion, with ease and assiduity." (§ 39.) Morawetz, in his work on Corporations, says: "The distinguishing feature of charitable corporations is that they are formed for the administration of charitable trusts, and

not for the profit of the corporators themselves; for example, corporations formed for the management of free hospitals and asylums for the relief of the poor, insane, blind, or otherwise helpless." (§ 4.) Kent, in speaking of eleemosynary corporations, says: " In this class are ranked hospitals for the relief of poor, sick and impotent persons, and colleges and academies established for the promotion of learning and piety, and endowed with property by public and private donations." (p. 275.) In Burrill's Law Dictionary, in defining the word " charitable," it is said: " This word, in the expressions ' charitable uses,' ' charitable trusts,' is understood in a very large sense comprising not only gifts for the benefit of the poor, but endowments for the advancement of learning, or institutions for the encouragement of science and art, and for any other useful and public purpose, as well as donations for pious or religious objects." In Grant on Corporations, 115, it is said: " The legal definition of charity * * * is a gift to a general public use, which extends to the rich as well as poor, and property held for public purposes is held for charitable uses in the legal sense of the term charity." (*Attorney-General* v. *Heelis*, 2 Sim. & S. 76; *Attorney-General* v. *Mayor*, etc., *of Dublin*, 1 Bligh [N. S.], 312, 357.)

It is doubtless true that in many of the authorities cited the word charitable has been given a broader and more comprehensive meaning than should be applied to it, as it occurs in the Constitution and statutes relating to the subject under consideration. We think that, in determining the question before us, it should be given only its usual and ordinary meaning, and that, when so understood and applied, the relator must be regarded as a charitable institution so far as it clothes, educates and maintains indigent pupils at public expense or by donations from individuals. So far as it educates pupils who pay for their tuition, board and maintenance, it is not to be regarded as a charitable, but only as an educational institution. As to those pupils, the board of charities has no jurisdiction or power of supervision. Being to an extent charitable as well as educational, it clearly falls within the provisions of

the Constitution and statutes as an institution of a charitable character or design.

The legislature has not attempted by general laws or otherwise to control the rules established by the board of charities, and, hence, the last sentence of section fourteen of article eight of the Constitution has no application to this case.

The contention of the respondent, that the various appropriations for the support and education of indigent blind pupils in its institution have been made in pursuance of the constitutional obligation to provide for the education of all the children of the state, cannot, we think, be sustained. That provision is as follows : " The legislature shall provide for the maintenance and support of a system of free common schools, wherein all the children of this state may be educated." (Art. 9, § 1.) Manifestly, this provision has no application whatever to the appropriations made by the state for the support and education of the indigent blind who have been inmates of the institution of the relator. In the first place, that provision is new, having gone into effect in 1895, and, as nearly all the appropriations made for the care and education of the blind by the relator were anterior to that time, they could not have been based upon it. Besides, that provision relates only to the public or common schools of the state, and has no application to an institution wholly or partly under private control.

It seems manifest that the appropriations prior to January 1, 1875, were made independently of the Constitution, because until that time there were no constitutional restrictions upon the power of the legislature to make appropriations of that character. After the amendment which went into effect in 1875, they were made under the special provision of the Constitution as amended, which permitted the legislature to make such provision for the education and support of the blind, the deaf and dumb and juvenile delinquents as to it might seem proper. Since the adoption of the Constitution of 1894 the appropriations have been made in pursuance of a similar provision contained in that

instrument. That the legislature had power to devote the money of the state to those purposes under the Constitution as amended in 1874 was clearly recognized in *Shepherd's Fold* v. *Mayor* (96 N. Y. 137, 145). In that case RAPALLO, J., said: "The general scheme of the constitutional provisions referred to seems to be that the general funds of the state shall not be given to local charitable institutions, except in aid of the blind, the deaf and dumb and juvenile delinquents." That such institutions were regarded as charitable is to be plainly implied from the language employed.

Again, the provision of the Constitution as to the education of all the children of the state in its common schools is a general one, while the provisions for the education and support of the blind, the deaf and dumb and juvenile delinquents are special, relating only to the classes enumerated. Therefore, it is obvious that, as to persons belonging to those classes, the special provisions must govern to the exclusion of the general one, and the former must be regarded as exceptions to the latter.

The claim that if the institution of the relator is charitable, then all the appropriations made to it by the state since the act of 1870 have been violative of the Constitution, seems wholly untenable. In *Shepherd's Fold* v. *Mayor* (*supra*) it was held that section ten of article eight of the Constitution did not prevent the application of state money to corporations or private institutions for the benefit of the blind, the deaf and dumb, and juvenile delinquents, as it made an exception from the general prohibition in favor of those objects. That seems to be the plain reading of the Constitution. Moreover, it was held in that case that, under section eleven of article eight, the counties, towns and municipalities of the State might devote money raised by local taxation to the support of the poor, and that the payment of money by a municipality to a private corporation for the support and education of orphans or friendless children, or for training and educating the children of poor clergymen, came within the exception permitting it to make provision for the support of its poor, and was not in conflict with that section. Within the principle of

that case, it seems clear that the state could appropriate its funds for the education and support of the blind, and that counties might appropriate the sum required for clothing the indigent pupils therein who were residents of the county making the appropriation.

If it be said that the third section of the act of 1870, requiring the counties of New York and Kings to appropriate money to enable this institution to furnish its indigent pupils with suitable clothing, is mandatory, and, hence, in conflict with and abrogated by section 14 of article 8 of the Constitution, as amended in 1894, the answer is, that chapter 754 of the Laws of 1895 is the law which controls, and, as it was intended to give effect to the amendments of the Constitution in that respect, and to cover the whole subject, it operated as a repeal of that section. If, however, this was not so, and the Constitution abrogated section three of the act of 1870, and section 230 of the charter of Greater New York is unconstitutional, I do not perceive how it would in any way change the character of the institution of the relator. It would simply furnish another reason why the decision in this case should be reversed, as, in that event, the supervisors would not be authorized to raise the amount specified.

Another argument presented by the respondent is that the charter of Greater New York authorizes the board of education to distribute a ratable proportion of the school fund to every pupil in the relator's institution, and, hence, it must be regarded as educational and not charitable. The defect in this argument lies chiefly in the assumption of the respondent that an institution cannot be educational and at the same time a charitable one. We have already seen that very many of the educational institutions of the land have been held to be charitable as well. When title four of chapter eighteen of the charter of Greater New York, which contains the provisions referred to, is examined, it shows conclusively that many, if not all, the charitable institutions of the city of New York, which are to any extent educational, are given a ratable proportion of the school fund. It gives a portion of that fund

to the schools maintained by the Five Points House of Industry; by the Ladies' Home Missionary Society of the M. E. C.; by the New York Orphan Asylum; by the Children's Aid Society; by the Roman Catholic Orphan Asylum; by the two half-orphan asylums; by the Society for the Reformation of Juvenile Delinquents; by the Leake and Watts Orphan House; by the almshouse for the city of New York; by the Association for the Benefit of Colored Orphans; by the Female Guardian Society; by the New York Juvenile Asylum; by the New York Infant Asylum; by the Nursery and Child's Hospital, and by the orphan asylums and industrial schools in the city of Brooklyn. To say that the appropriation of a portion of the school fund to the education of the inmates of these institutions changed their character from charitable institutions to institutions that are purely educational, seems quite absurd.

Any discussion of the question whether the statutes applying a portion of the common school fund to other than the common schools of the state are unconstitutional or otherwise, is wholly out of place at this time. If it be assumed that they are unconstitutional, provided those institutions are charitable in their character or design, it would only prove that the legislature had again overstepped the limits of the Constitution and passed certain statutes which were unauthorized. If such were the case, similar instances are not so rare as to render the enactment of such a statute sufficient evidence that these institutions were not of a charitable character or design, to overcome the facts which so clearly show such to have been their purpose. Besides, when we examine section 661 of the same act, we find that it expressly provides that no payments shall be made by the city of New York to any charitable institution wholly or partly under private control for the care, support, secular education or maintenance of any child surrendered to it, except upon a certificate that such child has been received and is retained by such institution pursuant to the rules and regulations established by the state board of charities.

It is true, as claimed, that the Constitution permits the legislature to make provision for the education of the blind, but to say that it, without qualification, permits the legislature to provide for separate education of the blind in an institution wholly or partly under private control, is incorrect. All the provisions of the Constitution relating to this subject should be read together. When so read, it becomes obvious that the power of the legislature to authorize counties to pay for the care, support or maintenance of the blind is limited by the constitutional provision which forbids such payments for any inmate of a charitable institution wholly or partly under private control, who is not received and retained pursuant to the rules established by the state board of charities. The question here is not whether the legislature may make provision for the education of the blind and appropriate money of the state for that purpose, but is, whether a county or city can pay its money to a charitable institution wholly or partly under private control for the care, support and maintenance of its inmates who are not received and retained therein pursuant to rules established by the state board of charities. Such payments are expressly forbidden by section 14 of article 8 of the Constitution as amended in 1894. The unqualified declaration of the Constitution is, that payments by counties or cities to charitable institutions wholly or partly under private control for care, support and maintenance may be authorized, but not required by the legislature ; but that no such payments shall be made for any inmate of such institution who is not received and retained pursuant to the rules established by the state board of charities. This declaration of the organic law is plain and unambiguous, and expressly forbids the appropriation of money by the counties and cities of the state to any such purpose, unless the inmates are received and retained in the manner stated. Its manifest purpose is to make all appropriations of public moneys by the local political divisions or municipalities of the state to institutions under private control subject to the supervision and rules of the state board of charities.

These considerations lead to the conclusion that the relator was, to an extent, a charitable institution, was, so far as it was charitable, subject to the visitation of the board of charities and the rules adopted by it, and that no payment could have been properly made to the relator for the maintenance or support of any indigent inmate not received and retained by it pursuant to the rules of that board.

Therefore, it follows that the orders of the Appellate Division and Special Term should be reversed, and the relator's motion for a peremptory writ of mandamus be denied, with costs to the appellant in all courts.

O'Brien, J. (dissenting).   The defendant, as comptroller of the city of New York, has in his hands the moneys raised by taxation for the purpose of furnishing clothing to blind pupils from that city receiving instruction in the New York Institution for the Blind, under § 3 of chapter 166 of the Laws of 1870.   The institution has presented to the comptroller the proper bills and vouchers upon which to draw the money, but he has refused to audit or pay them for the sole reason that the state board of charities has notified him that the institution has not complied with certain rules and regulations formulated by that body with respect to charitable, correctional and reformatory institutions.   There is nothing in the record or in the printed rules of the board to show what particular rule is claimed to apply to this institution or has been disregarded.

The managers of the institution assert that it is an educational and not a charitable corporation ; that it is engaged in the business of educating blind children and is in no just sense a charitable institution.   Moreover, they contend that it would be derogatory to its reputation, standing and success as an educational institution, engaged in the training and instruction of a special class of pupils, who are collected from all parts of the country and from other counties, to group it with poor houses, asylums and reformatories, rather than strictly educational institutions where it properly belongs.

That such a classification would convey a false impression of the character and objects of the institution and thus embarrass and hinder its work, is, of course, quite possible.

These objections to the position of the comptroller and the state board of charities are fully set forth by the managers in the papers that appear in the record and upon which the court, at Special Term, granted a peremptory writ of mandamus requiring the comptroller to audit and pay the bills. The Appellate Division has affirmed the order and the comptroller appeals to this court.

The controversy, in one aspect, turns upon the single question whether the relator, the New York Institution for the Blind, is a charitable or an educational institution. If it is to be classed with the former, and is fairly within the meaning of the provision of the Constitution hereafter referred to, then the state board of charities is entitled to participate with the managers in its government, and has jurisdiction over it for the purpose of prescribing rules and regulations and exercising visitorial powers, but if it is to be classed with the latter it has not.   The officers of the institution have stated in the moving papers as matters of fact, as already noted, that to classify the institution as one dispensing charity in some form, or as one the inmates of which are beneficiaries of charity in some form, would impair its reputation and usefulness as an institution of learning which it is claimed is its true character.   The specific grounds or reasons upon which the man» agers base this contention have not been stated in such a manner that we can fully appreciate their force, but it is quite obvious that we should not resort to any strained or refined construction of the Constitution or the statutes in order to bring the institution within that class of corporations known and designated as charitable or reformatory.   The true character of the corporation must be ascertained from the objects and purposes for which it was created, and the nature of the business in which it is now engaged.

The class to which any corporation properly belongs must be determined primarily from its powers and duties as enu-

merated in the charter. The object of its existence and the general functions which it may legally exercise and discharge are always supposed to be found in the statute from which its corporate life is derived.

The relator was incorporated under chapter 214 of the Laws of 1831 for the purposes clearly stated in the statute, in these words : "All such persons as now are or hereafter may become members of the said institution shall be, and are hereby constituted and appointed a body corporate and politic, in fact and in name, by the name and style of The New York Institution for the Blind, for the purpose of instructing children who have been born blind, or who may have become blind by disease or accident, and by that name they and their successors shall and may have succession and shall be in law capable of suing and being sued, pleading and being impleaded, defending and being defended in all courts and places whatsoever, in all manner of actions, suits, matters, complaints and causes whatsoever."

The purpose for which the corporation was created was, therefore, the instruction and education of children who have been born blind, or who may have become blind by disease or accident. It was not created for the purpose of administering any charity, or of dispensing alms for the relief of poor persons. It was a purely private corporation, organized for a purely educational work, namely, the instruction of a particular class of children. It has nothing whatever to do with the maintenance or care of that class known as the indigent blind, composed of persons of all ages and conditions. They are, no doubt, objects and beneficiaries of charity, and as such maintained and cared for by the state as a public charge in whole or in part. So far as this class are concerned, public moneys are raised and paid for care and maintenance and not for education. The indigent blind are beneficiaries of public charity in the same sense as the inmates of almshouses and poorhouses, though they may be maintained in separate and special institutions.

Those institutions are primarily charitable in their nature.

The inmates, as a general rule, have passed the educational period of life, and whatever of instruction or mental discipline they may receive is merely incidental to the main object, which is personal relief.

Money contributed by the state, or any of its political divisions, for the purpose of educating blind children, is in no sense charity, while that contributed for the support of the *indigent* blind is, or may be.

The duties and obligations of the state with respect to education should not be confused with those that concern the care and support of the poor and unfortunate. The two obligations rest upon distinct theories, and have been assumed upon principles and for reasons that differ widely from each other. The state, through the Constitution, has taken upon itself the duty of imparting to every child within its jurisdiction, whether rich or poor, an education sufficient to enable him to discharge the duties of good citizenship and to earn his living in some lawful calling. The legislature is commanded to provide for a system of free schools in which all children may be educated. (Art. 9, § 1.) That the state owes as much to the unfortunate child who has been born or become blind, as it does to the child that can see, is a proposition which, it may be assumed, no one will deny. The blind child becomes a citizen and must engage in the struggle for existence as well as the more fortunate one who can see. The state is bound to educate them both, but it is obviously impossible to discharge this duty in the same way or under the same system. The conditions that surround the two children differ so widely that, while one may be educated in the common schools, the other must be educated in a different school, with different modes of instruction and different rules of discipline. It was to meet this obvious want in the case of blind children that the relator was incorporated. The state has not assumed this duty of education from any motives of charity or benevolence. The obligation rests upon a very different and much more selfish principle. It is really the principle of self-protection. Since a free state, founded upon the popular will,

cannot exist unless sustained by intelligent and educated citizenship, the state itself assumes all the duties and obligations incident to such training and education. Hence, every child may claim from the state as a right such an education as will enable him to become a good citizen, and that term obviously implies reasonable fitness for all the duties of life. The state may, in some cases, furnish books for the child, and even clothing, but in doing so it dispenses no charity, but simply discharges an obligation which it has assumed. For every dollar that the state expends in the education of children, unable to educate themselves, it is supposed to receive an equivalent in a more elevated standard of citizenship.

But no one can claim charity as a right. Contributions for the support of the poor and unfortunate, whether they proceed from public or private sources, are purely voluntary and founded solely upon motives of religion and humanity. The demands of charity, whether upon individuals or the state, are always addressed to that conscientious sense of duty to relieve human suffering and to administer aid to those who are in distress.

While civilized governments in modern times do not disregard its claims, yet they are founded upon a duty of imperfect legal obligation. But the obligation to educate the children who are to become the future citizens is found in the express mandate of the Constitution, and enforced by compulsory laws.

Institutions that receive public or private funds for the support of the poor are properly classed as charitable institutions, since they dispense or administer charity in some form to those who are dependent upon it, and the inmates of such institutions are the beneficiaries and recipients of charity. But blind children who are educated wholly or partially by the aid of public moneys, are not the beneficiaries of any charity any more than the other children of the state who are educated at the public expense; and institutions for the education or instruction of blind children are not properly classed as charitable institutions any more than academies or schools

44 People ex rel. N. Y. Inst. for Blind *v.* Fitch. [Oct.,

Dissenting opinion, per O'Brien, J. [Vol. 154.

receiving state aid. Since all the children of the state may claim the benefit of an education as a right secured to them by the Constitution, the blind child who happens to receive instruction in a private institution to which the state has contributed money to a limited extent, because it cannot, in that case, fully perform the duty of education itself, cannot properly be classified as a pauper. He stands upon the same footing as every other child in the state, and is simply a beneficiary of its policy of free education. The general government, through the action of Congress, has made provision for the support and military education of young men selected from congressional districts according to law, but it has never been supposed that the institutions in which they are educated are of a charitable nature, or that the young men themselves were the objects or beneficiaries of any charity.

Keeping always clearly in view the broad distinction between education and charity, we may now examine the statute under which the money in question was raised, in order to ascertain the object and purpose to which it was to be devoted. It was clearly intended for one or the other of these objects, that is, charity or education, but it is important to determine which. The material parts of the act of 1870, and under which this controversy has arisen, are as follows:

"Section 1. The managers of the New York Institution for the Blind are hereby authorized to receive, upon the appointment of the Superintendent of Public Instruction, made for a term not exceeding five years, all blind persons, residents of the counties of New York and Kings, between eight and twenty-five years of age, who, in the judgment of the board of managers of said institution, shall be of suitable character and capacity for instruction, and shall have charge of their maintenance, education and support, and shall receive compensation therefor from the state in the same manner as is now provided by law. The term of such appointments may be extended from time to time, by the Superintendent of Public Instruction, on the recommendation of the board of managers of the said New York Institution for the Blind, for such

further period as they may deem advantageous in each individual case.

"Section 2. Application for admission into the institution shall be made to the board of managers, and each application shall set forth the age, the fact of blindness, and that the applicant is a legal resident of the town, county and state claimed as his or her residence, with such other information as the board may require ; and each application shall be sworn to by the applicant, or his or her parents or guardian, and shall be signed by at least one member of the board of supervisors of the county in which the applicant may reside, and also be recommended by the president and superintendent of the said institution, and transmitted by the said institution to the Superintendent of Public Instruction.

"Section 3. The supervisors of the county of New York or Kings, from which State pupils shall be sent to and received in the said institution, whose parents or guardians shall, in the opinion of the Superintendent of Public Instruction, be unable to furnish them with suitable clothing, are hereby authorized and directed in every year while such pupils are in said institution, to raise and appropriate fifty dollars for each of said pupils from said counties respectively, and to pay the sum so raised to the said institution, to be by it applied to furnishing such pupils with suitable clothing while in said institution."

It will be seen that the institution is not obliged to receive any of the persons mentioned in the statute. It is a private institution, and may receive them or not at discretion. It has no power or right to receive them for any purpose but that of instruction or education. It can admit only such as are within certain age limits, embracing the educational period of life, and then only for a limited time. It cannot receive them otherwise than upon the appointment of the Superintendent of Public Instruction, who is the head of the educational department of the state. The children must, in the judgment of the managers, be of suitable character and capacity for instruction. The Superintendent cannot properly appoint the per-

sons described, and the managers cannot properly receive them into the institution, except for the purpose of education. They may or may not be poor children, since the statute is silent on that point. The Superintendent may make the appointment according to his own judgment, but whether they are rich or poor the manifest purpose of placing them in the institution is education. They cannot enter for the purpose of support or as beneficiaries of charity. It is true that when received the state pays for their education and support, but support and maintenance are, in that case, merely incidental to education. The children cannot be educated without being kept in the institution, and so education and support must go together, and the state pays for all. But this is not charity. It is the discharge of the obligation which the state has assumed, to furnish to all children an education to fit them for the duties of citizenship. None of the children thus instructed are the beneficiaries or recipients of charity, any more than the children educated in the free common schools. In both cases the state is discharging the obligation, but in different ways and by different methods, since the circumstances and conditions of the children are different, but the theory and principle upon which it acts are in both cases the same. The sole purpose of collecting these blind children in this institution and retaining them there was, not relief from poverty or want, but to impart to them some useful knowledge, which is the end and aim of all education.

Since the enactment of the statute of 1870 the state has paid to this institution nearly a million and a quarter dollars out of the public treasury for the education of blind children. This vast sum was not a contribution by the state to charity, any more than the many millions which were paid during the same time for the support of free common schools.

In each case the money was really raised and paid for the same general purpose and in pursuance of the same general policy. The difference was in the methods employed to accomplish the same result, which was education. The private institutions which received and educated these blind

children under contract with the state were not for that reason charitable institutions any more than the schools and academies in which the other children of the state were educated. They cannot be properly classified otherwise than as educational institutions.   The state makes use of them as instrumentalities for discharging the obligation enjoined by the Constitution to provide for the education of all the children of the state.   Most clearly the relator is not a charitable institution unless it is engaged in administering some charity of which the inmates, or some of them, are the beneficiaries. What charity does it dispense and what alms do the inmates receive ?   Whoever asserts that the institution is of a charitable nature should be able to answer these questions clearly and satisfactorily.   The institution receives no money from the public for which it does not render a full equivalent, and, therefore, it receives nothing for charity.   It is beyond dispute that the work in which it is engaged is the education of blind children of a certain age, under contracts with their parents or guardians, which include not only instruction, properly so called, but support for the time during which the educational process is in operation.   From the nature of the case, it is impossible to educate these children in one place and support them in another.   The main object, which is education, includes the incident of support for the time being, since the two things are inseparable.   The institution does nothing for charity.   It educates blind children for a fixed compensation under an agreement, express or implied, purely as a matter of business.   The state is one of its patrons for the reason that, having assumed the obligation to educate the blind as well as all other children within its borders, it can discharge that obligation as well or better by employing the relator than by building and maintaining like institutions of its own.   Hence, it sends, through its constituted authorities, children to this institution under contracts, and when they are received they are on precisely the same footing as the children placed there by parents or guardians.   It pays for their instruction and, incidentally, for their support while in the institu-

tion, not from any motives or upon any principles of charity, but in order to promote its own interests by preparing the children to assume the duties of citizenship, to engage in the affairs of life and, so far as possible, to help themselves in the world, instead of becoming a charge upon the public. It was only upon this theory that the legislature could lawfully have authorized the payment of the large sum already mentioned to this institution, since, as we shall presently see, if the relator is a charitable institution and the money was given and received for a charitable purpose, the legislature, in appropriating it, and the state comptroller, in disbursing it, violated the plain restrictions of the Constitution ; and yet no question is raised here as to the legality and propriety of these payments by the state.

The contention of the defendant is limited to the money raised by the county, under the third section of the act, for the purpose of furnishing clothing to certain of the pupils admitted upon the appointment of the Superintendent of Public Instruction, when, in his opinion, the parents or guardians of any of the children so admitted shall be unable to furnish it. The argument is, that since this money, raised by local taxation, is to be paid to the institution for the purpose of defraying the expense of clothing such children as may be unable to procure the proper clothing otherwise, it is a gift for charitable purposes, and the institution receiving it becomes a charitable institution.

This contention is, I think, quite inadmissible. The discipline of the institution requiring a uniform dress is incidental to the process of education, and, from the nature of the case and the circumstances in which the children are placed, a part of the obligation which the state has assumed and may devolve upon the locality. But money paid for clothing under such conditions is not charity any more than money paid for books or other means of instruction would be. Should the state or a county assume the obligation to furnish books or even clothing for certain poor children in order to enable them to attend the common schools, it would not be a gift to

charity, and the schools would not thereby be converted into charitable institutions, nor could the children benefited by the contribution be properly classed as paupers. They would, indeed, be properly classed as beneficiaries of the system of free education enjoined by the Constitution ; but that is quite a different thing. The obligation to maintain a system of free education for all may properly carry with it many incidental things involved in or connected with the main object.

The consideration of the provision of the present Constitution on this and kindred questions is now in order, as it is upon these provisions that the contention of the defendant mainly rests. They are to be found in certain sections of article eight, and so far as they have any relation to the questions in this case read as follows :

" Section 9. Neither the credit nor the money of the State shall be given or loaned to or in aid of any association, corporation or private undertaking. This section shall not, however, prevent the Legislature from making such provision for the education and support of the blind, the deaf and dumb, and juvenile delinquents, as to it may seem proper. Nor shall it apply to any fund or property now held, or which may hereafter be held, by the State for educational purposes."

" Section 10. No county, city, town or village shall hereafter give any money or property, or loan its money or credit to or in aid of any individual, association or corporation, or become directly or indirectly the owner of stock in, or bonds of, any association or corporation ; nor shall any such county, city, town or village be allowed to incur any indebtedness except for county, city, town or village purposes. This section shall not prevent such county, city, town or village from making such provision for the aid or support of its poor as may be authorized by law. *   *   *"

" Section 11. The Legislature shall provide for a State Board of Charities, which shall visit and inspect all institutions, whether State, county, municipal, incorporated or not incorporated, which are of a charitable, eleemosynary, correctional or

7

reformatory character, excepting only such institutions as are hereby made subject to the visitation and inspection of either of the commissions hereinafter mentioned, but including all reformatories except those in which adult males convicted of felony shall be confined; a State Commission in Lunacy, which shall visit and inspect all institutions, either public or private, used for the care and treatment of the insane (not including institutions for epileptics or idiots); a State Commission of Prisons who shall visit and inspect all institutions used for the detention of sane adults charged with or convicted of crime, or detained as witnesses or debtors."

" Section 13. Existing laws relating to institutions referred to in the foregoing sections and to their supervision and inspection, in so far as such laws are not inconsistent with the provisions of the Constitution, shall remain in force until amended or repealed by the Legislature. The visitation and inspection herein provided for, shall not be exclusive of other visitation and inspection now authorized by law."

" Section 14. Nothing in this Constitution contained shall prevent the Legislature from making such provision for the education and support of the blind, the deaf and dumb, and juvenile delinquents, as to it may seem proper; or prevent any county, city, town or village from providing for the care, support, maintenance and secular education, of inmates of orphan asylums, homes for dependent children or correctional institutions, whether under public or private control. Payments by counties, cities, towns and villages to charitable, eleemosynary, correctional and reformatory institutions, wholly or partly under private control, for care, support and maintenance, may be authorized, but shall not be required by the Legislature. No such payments shall be made for any inmate of such institutions who is not received and retained therein pursuant to rules established by the State Board of Charities. Such rules shall be subject to the control of the Legislature by general laws." (Art. 8.)

" Section 1. The Legislature shall provide for the maintenance and support of a system of free common schools,

wherein all the children of this State may be educated." (Art. 9.)

" Section 4. Neither the State nor any subdivision thereof, shall use its property or credit or any public money, or authorize or permit either to be used, directly or indirectly, in aid or maintenance, other than for examination or inspection, of any school or institution of learning wholly or in part under the control or direction of any religious denomination, or in which any denominational tenet or doctrine is taught." (Art. 9.)

It will be seen upon a careful reading of these sections that two vital points involved in this case, and which, in my opinion, control the decision, are made perfectly clear.

1. The prohibition against payments of public money by cities or other political divisions of the state to institutions where the inmates have not been received and retained therein, pursuant to rules established by the State Board of Charities, applies only to charitable, correctional or reformatory institutions, wholly or partly under private control, for care, support or maintenance. The institutions subject to visitation and regulation by that board must belong to the class specified, and the inmates must have been received and retained therein for the purpose specified, that is, for *care, support and maintenance.* The relator is an educational institution and the inmates are received and retained therein for the purpose of education and instruction and not as poor persons or *for care, support or maintenance.* We have already seen that they could not lawfully have been placed in this institution for any such purpose. If their parents or guardians were unable to support or maintain them they should have been placed in some institution for the indigent blind. The state, in selecting children for instruction in this institution, cannot take into consideration the poverty or wealth of the child.

The relator is not an asylum for the relief of poverty or want in any form or in any degree, but a school for the education of the blind, and the state, when extending the benefits of such an institution to a limited number of the children that it assumes to educate, has no right to place upon them, or

any of them, a badge of pauperism any more than the general government has the right to send the West Point graduates out into the world as poor scholars or the beneficiaries of charity.

2. The restrictions contained in the Constitution upon the payment of public moneys to private institutions, except that contained in § 4 of article 9, have no application to appropriations or moneys for the education of the blind. The broad and sweeping prohibition of the section last referred to against payments to certain religious institutions doubtless apply to all public moneys or property and to every form of public aid, but obviously it has no application to this case since the relator is not an institution that comes within the words of the section.

It is suggested that it was the intent and purpose of the constitutional provisions above cited to subject all institutions receiving public aid in any form, whatever their character may be, to visitation and regulation by the State Board of Charities, but this proposition is clearly indefensible. Schools, academies, colleges and other educational institutions receive public money from the state or localities, but no fair construction of the Constitution can bring them within the scope of the powers vested in the department of charities. Nor is it at all necessary in furtherance of any sound public policy to resort to any strained construction to accomplish such a result. They are all subject to visitation by the head of the educational department and thus every public interest is amply protected. (Laws of 1894, ch. 536, art. 14, § 40.)

There is another view of the case that is entitled to great weight in the inquiry whether the relator is a charitable institution or one for educational purposes. It cannot be held that it is of a charitable nature without condemning as unconstitutional and void the acts of the legislature passed in every year since the enactment of the statute of 1870, the action of the State Comptroller in paying the money so appropriated to this institution and all existing laws providing for or requiring such payments. This result must inevitably follow the conclusion that the relator is a private charitable institution, if that view should prevail.

1. It was held in the case of *Shepherds' Fold* v. *Mayor* (96 N. Y. 137) that the state could not appropriate and pay from its treasury public money for the support of the poor in a private charitable institution for the reason that the Constitution forbids it, but that such prohibition did not apply to moneys raised by local taxation. In so far as the state is concerned the Constitution is the same now as it was then. But we have seen that the state *has* appropriated, and that the State Comptroller has paid in every year since the act of 1870 was passed, moneys to this institution as compensation for the support of the children placed there by the Superintendent of Public Instruction, which amounts in the aggregate to the sum above stated. Now, if the relator is a charitable institution and the money was paid for the support of the poor, or as charity to relieve distress, the Constitution was clearly violated and the money paid without authority of law. It is only upon the theory that the money was paid to a private educational institution as compensation for the education of blind children that the payment by the state of such a large sum of money to the relator can be justified or defended. In my opinion it was properly appropriated and paid upon that principle, since the payment of money for the education of the blind is expressly excepted from the restrictions of the Constitution.

2. The third section of the act of 1870, which requires the city of New York to raise the money in controversy to defray the expense of clothing certain children placed in this institution, is clearly mandatory, and as mandatory laws for such payments by cities or counties to charitable institutions are now forbidden by the Constitution, the statute is abrogated entirely. (*People ex rel. Inebriates' Home* v. *Comptroller, etc.*, 152 N. Y. 399.) But if it should be considered as a statute requiring the city to raise money for the education of blind children, as I think it should be, the Constitution does not invalidate it.

3. The act of 1870, in so far as it requires the city of New York to raise and pay money for clothing pupils in this institution, has virtually been superseded by the recent statute,

known as the charter for Greater New York, which requires the city in each year to raise and pay to the relator $50 for each state pupil in the institution from that city whose parents, in the opinion of the Superintendent of Public Instruction, shall be unable to furnish them with suitable clothing, to be by it applied to furnishing such pupils with suitable clothing while in said institution. This is also plainly a mandatory enactment, and is clearly a violation of the Constitution if the relator is to be classed as a private charitable corporation. But if the money thus provided for should be regarded as a contribution for the education of the blind within the limits of the new city, as it clearly should be, the validity of such a provision is beyond question. But it is only upon this theory, which is wholly inconsistent with the defendant's contention, that the statute can be maintained. (Laws 1897, ch. 378, § 230, par. 22, sub. 6.)

4. The charter also contains another provision which in its relation to the question under consideration is worthy of notice. By § 1161 the board of education is required to distribute to the managers of this very corporation a ratable proportion of the school fund to every blind pupil in the institution without regard to age. Assuming, for the purpose of the argument, that it is a charitable institution, as claimed by the defendant, this enactment is clearly in violation of the Constitution for two reasons: (1) It is mandatory, requiring a local board to distribute funds in its hands or under its control for local school purposes to a private charitable institution for charitable purposes. (2) It diverts the school fund to charitable uses in disregard of the express inhibition of the fundamental law. (Con. art. 9, § 3; *People* v. *Board Ed. of Brooklyn,* 13 Barb. 400; *Gordon* v. *Cornes,* 47 N. Y. 608; *People ex rel. S. A. Observatory* v. *Allen,* 42 N. Y. 404.)

It is only upon the theory that the institution is a school for the education of the blind that a statute, virtually providing that the pupils shall share in the public moneys for school purposes in the same way and in the same proportion as the children educated in the common schools, can be upheld.

It ought not to require argument to prove that money raised by taxation for school purposes, or derived from the income of the school fund, cannot be devoted to charity or paid for the benefit of a charitable institution. Such a diversion of a fund would be a manifest fraud upon the taxpayers, even if there were no constitutional restrictions in the way, and yet that is precisely what the legislature has done by this section of the charter if the relator be a charitable institution, and the money is to be paid to it for a charitable purpose.

But if the legislature has authorized it to be paid to an educational institution and for the purpose of educating blind children, as I think it has, then it was devoted to the very purpose for which it was intended when raised. This provision of the charter cannot be sustained upon any other principle under the restrictions of the Constitution.

It is quite apparent from what has been stated that the legislature, the recent commission of eminent citizens charged with the important duty of preparing a charter for the new city, as well as the chief financial officer of the state, have all acted upon the theory, in dealing with this institution, that it was an educational and not a charitable corporation. This theory underlies all the legislation referred to, and in administration has been assumed or adopted by every agency of the state.

The learned counsel for the defendant have evidently overlooked an important feature of this case, which has been incidentally referred to in the preceding discussion, but which should perhaps be stated with more distinctness.

The legislature, in providing money for the education of the blind, is a law to itself. It is left perfectly free to act as it may think proper, and is not bound by any of the constitutional restrictions or limitations referred to. The language of the Constitution is so clear on this point that it is impossible to misconceive the meaning.

" Nothing in this Constitution contained shall prevent the Legislature from making such provision for the education and support of the blind  *  *  *  as it may deem proper."

Thus the legislature is given free scope in making provision for the education of the blind. It may grant money for that purpose to public or private institutions, to be raised by general or local taxation. It may direct the payment of such money to such institutions without any conditions whatever, except such as it may itself see fit to impose. The constitutional condition that payments shall not be made unless the inmates are received and retained under the rules of the State Board of Charities, is in that case silent. Neither that nor any of the other restrictions have any application to grants of money for the education of the blind. All appropriations for that particular purpose are subject only to the judgment and discretion of the legislature. In the case at bar the legislature has enacted that certain moneys raised by local taxation shall be paid to the relator. It has granted the money and made it payable without any conditions whatever. But the defendant, as the administrative officer who has charge of the fund, refuses to pay it over unless certain conditions have been complied with by the relator. These conditions, by the very words of the Constitution, have no application to moneys raised for this particular purpose, and the legislature itself has not attached any such conditions to the grant.

Thus the defendant of his own will requires the relator, before it can receive the money granted to it by the legislature, to comply with certain conditions or rules that, so far as the relator is concerned, have no foundation in the Constitution or any statute.

The legislature has provided, as we have seen, by general laws that institutions for the education of the blind shall be subject to visitation by the Superintendent of Public Instruction, but that is not made a condition of the payment of the money in question. It has also provided that charitable institutions shall be subject to visitation by the State Board of Charities (Laws 1896, ch. 546, art. 1, §§ 2, 10), but that is not made a condition upon which the relator is to receive the money in question. One of these statutes (Laws of 1895, ch. 771, § 11) provides that institutions for the blind shall be sub-

jected to such visitation by the State Board of Charities *as the Constitution provides.*  It provides for inspection of *charitable* institutions, and those include only such institutions as are devoted to the care and support of the *indigent* blind as part of the poor, not blind children who are being educated at the public expense in whole or in part.  The relator has charge of a large number of blind children who have been placed there, and are paid for by parents or guardians.  That class constitute the vast majority of the pupils.  If there were no others, surely no one would then claim that it was a charitable institution.  It would be absurd to assert that, when every pupil paid his own way, there was any element of charity connected with the relator's operations.  Manifestly it would then be a private school for the blind, and nothing else.  But how can it be said that when the state becomes a patron of such a school, and sends children there, that it has assumed an obligation to educate and makes contracts for their education and support while in the institution, just as parents and guardians make contracts, that the character of the institution is changed from a private school to an institution of charity.  It is more reasonable to say that the state may educate a few of its unfortunate blind children in a private school for that purpose, without classifying them with the objects and beneficiaries of charity.  But, apart from all this, can there be any doubt that it is perfectly competent for the legislature to pass a mandatory act providing for the support and education of the blind by taxation upon a city, town or county, and directing the money to be paid to a private institution, such as the relator is, irrespective of any rules of the State Board of Charities?  The Constitution answers the question by expressly enacting that nothing therein contained shall prevent the legislature from doing that very thing, and if it may do that, then the relator is entitled to receive the money in question without compliance with any conditions whatever, since the restriction upon payments by localities, without compliance with the rules of the board of charities, has no application to such a case.  The plain meaning of the Constitution is that

8

the legislature may place blind children in such institutions as it may think proper, whether public or private, charitable or non-charitable, and provide for their education and support with public money raised either by general or local taxation, and it may direct that money to be paid to the institutions in which such children have been placed, without compliance with the rules of the board of charities, or any other condition whatever.　Nothing in the Constitution can prevent the legislature from executing its own policy, whatever it may be, when making provision for educating the blind.　The relator is most clearly a private corporation or institution of some kind.　It has no public or political functions of any kind to perform.　It has no relations with the state save those which every other private corporation has.　The income which it receives, and the funds which it has or owns, are derived solely from the prosecution of its corporate business, which is the education of blind children.　It does not depend upon or derive anything, so far as appears, from charitable gifts or donations, public or private.　It is not engaged in dispensing the gratuities of the benevolent or charitable grants from the state, but is conducting its operations with its own means.　It receives pupils from parents and guardians, and from the state, and educates them for pay.　It receives nothing from charity, and gives nothing to charity.

Whatever moneys it receives from the state or from localities it receives for the same purpose and in the same way as that from parents and guardians, and it renders to the state the same services and returns the same equivalent.

It is not bound by any law to receive pupils from the state or to retain those which it has received, but may discharge the state pupils at any time, and then, certainly, it would be nothing but a purely private school, supported by the private contributions of the parents and guardians, and, certainly, it would then be impossible for any reasonable man to consider or classify it as a charitable institution.　But the true character of the institution, whether charitable or educational, is not to be determined by the presence or absence of a few state pupils,

but by the general objects of its incorporation and the nature of the business in which it is engaged.

It cannot be a charitable institution to-day and an educational institution to-morrow, depending always upon the circumstance whether the state is or is not one of the patrons of the school. It is always either the one or the other, and if it is not charitable when no state pupils are retained, it is not made such by the mere fact that the state makes use of it for the purpose of discharging its obligations to provide for the education of all the children within its limits.

There is nothing to show that any of the state pupils could not have been supported and maintained by the parents and guardians at home, but that would not comply with the policy of the state to see to it that even blind children should receive the benefit of an education so far as possible.

The restrictions with respect to payments by localities to charitable, correctional and reformatory institutions, without compliance with the rules of the State Board of Charities, had no reference whatever to such institutions as the relator. This, I think, is clear, not only from what has been said, but from the very language of the Constitution itself and the relation which the restrictive words bear to the rest of the section in which they appear. The first sentence of the section takes every provision for the education of the blind out of every restriction in the Constitution, and leaves the legislature at liberty to deal with that subject at discretion. The rest of the section deals with other classes of persons and other institutions, namely, orphan asylums, homes for dependent children or correctional institutions, whether under public or private control, and localities are permitted to make provision for the care, support, maintenance and secular education of their inmates. Having taken these specified institutions out of the general restriction in section ten of the article against loans or gifts of money by cities, towns or villages to individuals, associations or corporations, the remainder of the section simply regulates the manner in which such gifts or grants to such institutions shall be made. It provides, first, that the legisla-

ture may authorize but shall not require them; and, secondly, that the money shall not be paid to the institution unless the inmates are received and retained therein pursuant to the rules of the department of charities.   The framers of the Constitution, in prescribing the regulations, applied them specifically to "charitable, eleemosynary, correctional and reformatory institutions, wholly or partly under private control," and again to "such institutions," but it is manifest that these terms are simply descriptive of the institutions specifically named in the preceding part of the section, that is, orphan asylums, homes for dependent children and correctional institutions, and were not intended to include schools for the education of the blind.   This section of the Constitution simply provides that the legislature may authorize, but not require, localities to provide for the support and secular education of the inmates of orphan asylums, homes for dependent children or correctional institutions, but that payments shall not be made to them unless the inmates are received and retained under the rules of the board of charities.

The restriction applies only to those institutions specifically named in the section, for the benefit of which localities were permitted to raise money.   It could not possibly apply to the relator, since, by the express words of the first part of the section, the legislature was completely emancipated from all restraints when providing for the support and education of the blind.   We are concerned in this case with but one question, and that is, whether a financial officer like the defendant may withhold money in his hands from the relator when it has been appropriated by the legislature unconditionally, until it complies with the regulations of the state board of charities. In other words, whether the restriction upon payments by localities to charitable institutions has any application to the relator.   It seems very clear to me that it has not.   It was manifestly intended for another class of institutions since all restrictions upon legislative provisions for the education of the blind were removed and the whole subject left with the legislature.   It seems to me impossible, therefore, by any fair pro-

cess of reasoning or argument to classify this institution among those designated in the Constitution as charitable, correctional or reformatory, or to include the pupils placed and retained therein among the beneficiaries of charity, or to apply the restrictions of the Constitution to such a case.

This discussion has assumed a scope and extent that might seem, at first view, to be wholly unnecessary. The only purpose has been to elucidate a question of some public importance, closely related to legislation and administration, and with respect to which there is not only a wide divergence in the views of counsel, but, apparently, some conflict of opinion among ourselves. If the discussion has contributed anything tending to reconcile opposing views, or to point out the correct solution of the question, it is to be hoped that the fault of prolixity may be overlooked.

The order should be affirmed, with costs.

MARTIN, J., reads for reversal. All concur, except O'BRIEN, J., who reads for affirmance, and GRAY, J., absent.

Orders reversed.